# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| FREDERICK K. POULIN, JR. )<br>                 Plaintiff, )<br>v. )<br>THE THOMAS AGENCY, and JOHN )<br>HILLS d/b/a/ GLENWOOD BUILDING & )<br>REMODELING, )<br>                 Defendants. ) | Docket No. 09-cv-575-GZS |

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

Before the Court is the Motion for Summary Judgment (Docket # 26) filed by Defendant John Hills d/b/a Glenwood Building & Remodeling. As explained herein, the Court GRANTS Defendant's Motion.

**I.  LEGAL STANDARD**

Generally, a party is entitled to summary judgment if, on the record before the Court, it appears "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. A "material fact" is one that has "the potential to affect the outcome of the suit under the applicable law." Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 703 (1st Cir. 1993) (citing Anderson, 477 U.S. at 248) (additional citation omitted).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the Court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. Santoni v. Potter, 369 F.3d 594, 598 (1st Cir. 2004).

Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." Triangle Trading Co. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); Fed. R. Civ. P. 56(e). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." In re Spigel, 260 F.3d 27, 31 (1st Cir. 2001) (quoting In re Ralar Distribs., Inc., 4 F.3d 62, 67 (1st Cir. 1993)).

## II.  FACTUAL BACKGROUND

Construing the parties' statements of material facts in accordance with the above standards and Local Rule 56 reveals the following:

Frederick K. Poulin, Jr. ("Dr. Poulin" or "Plaintiff") and his wife, Susan Poulin ("Mrs. Poulin") own a home in Cape Elizabeth, Maine. In 2008, the Poulins sought to repair leaking roof windows—which had been added to their home twenty years earlier—or failing that, to install custom replacements. In late May, the Poulins contacted Mr. Hills of Glenwood Building and Remodeling for the purpose of acquiring an estimate for this work.

Mr. Hills came to the Poulins' home on three occasions over the course of several months.[1] During the first meeting, Mr. Hills inspected the windows, determined that, in his professional opinion, repair was not an option, and stated that he believed custom windows could be purchased for $600.00 to $700.00 per window. Prior to his next meeting with Dr. Poulin several weeks later, Mr. Hills contacted a few window companies and manufacturers. At this second meeting, Mr. Hills verbally informed Dr. Poulin that his research showed that the cost for custom windows would be approximately $30,000.00. Mr. Hills also informed Dr. Poulin that all of the manufacturers he contacted required a curb system and refused to warranty or guarantee any window which was not installed to their specifications. Dr. Poulin had problems with the curb system requirement, and informed Mr. Hills that he wanted the windows to be installed flush to the roof and not set at a minimum of three inches above the shingles. During the third (and final) meeting three to four weeks later, Mr. Hills again suggested the alternative of installing raised skylights. During their discussions, Mr. Hills presented to Dr. Poulin information about two or three manufacturers/suppliers but did not present any drawings or diagrams.

In the course of developing a proposal and estimate for the Poulins, Mr. Hills expected to be compensated for the time spent investigating these possible solutions for the leaking windows. The Poulins, however, at no time discussed with Mr. Hill compensation for his research in preparing an estimate or his hourly rate.

From the Poulins' perspective, the only solution offered by Mr. Hills was essentially to tear up the roof and replace the existing windows with raised skylights—an option that was not acceptable to them. After three meetings, Dr. Poulin had increasing concerns about Mr. Hills' timeliness as well as his skills and knowledge to perform the work needed. As such, when Mr.

---

[1] Mrs. Poulin was present during the first meeting with Mr. Hills but was not involved in the later discussions.

Hills called to set up a fourth meeting, Dr. Poulin informed him over the phone that his services were no longer required. As a "nice gesture," and because Dr. Poulin "felt sorry" for him, Dr. Poulin requested for Mr. Hills to send him an itemization of his time and stated that he would "consider sending [Mr. Hills] something." (F. Poulin Aff. (Docket # 29-1) at 2 ¶7; S. Poulin Aff. (Docket # 29-1) at 6 ¶5; F. Poulin Dep. Tr. (Docket # 34) at 65:12-14, 69:19-20, 70:1-8, 70:24-25, 77:6-8.)

Approximately two weeks later, in early August of 2008, Mr. Hills sent the Poulins a statement for $500.00, without any itemization of his time and lacking any description of services rendered. Upon receipt of this statement, Mrs. Poulin called and left a message stating, in part, that she was aware of the conversation Mr. Hills had over the phone with her husband, but informing him that she had problems with the price indicated as well as the lack of itemization.

The Poulins at no time asked Mr. Hills to do any actual renovation or repair work at their house. Mr. Hills did not perform any manual labor on the property nor did he provide any materials. The Poulins never entered into any written contract with Mr. Hills, nor were they ever provided with a written construction contract by Mr. Hills.

The Poulins ultimately hired a different contractor, Androscoggin Glass & Aluminum, to repair their leaking windows. On November 5, 2008, Androscoggin Glass & Aluminum gave the Poulins a written estimate for $9,831.90, including materials and labor, which provided a description of the proposed work. (See F. Poulin & S. Poulin Affs., Ex. A.) Androscoggin Glass & Aluminum ultimately repaired the existing windows, in a manner which met all of the Poulins' specifications, for approximately $12,000.00.

In the meantime, in October 2008, Mr. Hills retained Defendant The Thomas Agency ("TA") to collect funds from Plaintiff for breach of contract. TA reported the account to each of

Dr. Poulin's three major credit reporting agencies as an outstanding liability that had been charged off or placed for collection. Dr. Poulin's credit score declined by approximately 50 points due to these negative notations. In August 2009, Plaintiff and his daughter were both denied Maine Education Services student loans due to the "charge off" reported by TA. After being confronted by Dr. Poulin, TA notified the credit reporting agencies that the account notation should be deleted; as a result, the Poulins' daughter's loan application was approved, at the same interest rate, one day after it was initially denied. Dr. Poulin "may have incurred" a higher loan financing fee as a result of the negative credit report notations. (Pl.'s Opp'n Statement of Material Facts ("Opp'n Facts") (Docket # 30) at 5 ¶21.)

## III. PROCEDURAL HISTORY

Based on these facts, Dr. Poulin filed this lawsuit, bringing various state and federal claims against Defendant TA—under the Fair Debt Collection Practices Act (Count I), the Maine Fair Debt Collection Practices Act (Count II), the Maine Fair Credit Reporting Act (Count IV), and state law tort claims of interference with a prospective economic advantage (Count V) and invasion of privacy (Count VI)—as well as a single claim against Hills for violations of both the Maine Home Construction Contracts Act ("HCCA") and the Maine Unfair Trade Practices Act ("UTPA") (Count III). (See Compl. (Docket #1).) Defendant Hills filed a motion to dismiss Count III for lack of federal court jurisdiction and Defendant TA filed a motion to dismiss the state law claims contained in Counts IV-VI. (See Docket #s 5 & 7.) On April 27, 2010, the Court entered a single order denying Defendant Hills' motion to dismiss but granting Defendant TA's.[2] (See Order on Mots. to Dismiss (Docket # 12).) Thus, what currently remains of

---

[2] In denying Defendant Hills' motion to dismiss, the Court determined that there was a loose factual connection between Count I (alleging that TA violated the Fair Debt Collection Practices Act by "reporting an account as in collection when no such account was legally owed" (Compl. ¶ 22)) and Count III (alleging that Hills violated Maine law by failing to provide a written estimate and contract, as well as retaining a collection agency when no valid debt existed). Because the Court has original jurisdiction over Count I, the Court concluded that convenience and

5

Plaintiff's original Complaint are Count III against Defendant Hills and Counts I & II against Defendant TA.

On May 13, 2010, Defendant Hills filed his Answer to Count III, and asserted, as a Third-Party Complaint against Mrs. Poulin and as Counterclaims against Dr. Poulin, state law claims for breach of contract (Count I), unjust enrichment (Count II), quantum meruit (Count III) and violations of the Maine Construction Contracts Act ("CCA"), 10 M.R.S.A. § 1111 et seq. (Count IV). (Def. Hills' Answer, Counterclaim & Third Party Claim ("Hills' Answer") (Docket # 13) at 8-9 ¶¶10-23.)[3] On June 3, 2010, Mrs. Poulin filed her Answer to Hills' Third-Party Complaint, and asserted a Counterclaim against Mr. Hills for violations of the HCCA and the UTPA—the same allegations made in Count III of the original Complaint. (See S. Poulin Answer to Third Party Claims & Counterclaim ("S. Poulin Counterclaim") (Docket #19) at 6 ¶¶1-5.)

## IV. DISCUSSION

Defendant Hills moves for summary judgment on Count III of the Complaint filed by Dr. Poulin and on the Counterclaim filed by Mrs. Poulin, arguing that neither the HCCA nor the UTPA encompasses the contract dispute between the parties. The Court addresses each act in turn below.

### A. Maine's Home Construction Contracts Act, 10 M.R.S.A. § 1486 et seq.

Maine's HCCA provides that "[a]ny home construction contract for more than $3,000 in materials or labor must be in writing and must be signed by both the home construction contractor and the homeowner[.]" 10 M.R.S.A. § 1487. A "home construction contract" is a

---

judicial economy weighed in favor of having these counts litigated in the same court. Accordingly, the Court exercised its discretion and invoked supplemental jurisdiction over Count III pursuant to 28 U.S.C. § 1367. (See Order on Mots. to Dismiss at 6-7.)

[3] In bringing these state law counterclaims, Mr. Hills asserts that this Court has jurisdiction over the Counterclaim and Third-Party Complaint "for the same reasons the Court asserts jurisdiction over" the UTPA and HCCA claims contained in Count III. (See Hills' Answer at 6 ¶3.)

"contract to build, remodel or repair a residence, including not only structural work but also electrical, plumbing and heating work; carpeting; window replacements; and other nonstructural work." Id. at § 1486(4).

In Count III and in Mrs. Poulin's Counterclaim, the Poulins assert that Hills acted in violation of the HCCA by "failing to provide a written estimate of costs for his services[.]" (Compl. ¶31(1); S. Poulin Counterclaim at 6 ¶3(1).) Hills moves for summary judgment on this portion of Count III and the Counterclaim by pointing out that the HCCA does not require an estimate to be in writing. The Court agrees. A written estimate is not explicitly included in HCCA's list enumerating the fourteen components that must be included in any legally drafted home construction contract. See 10 M.R.S.A. § 1487. Rather, a "contract price" is listed as a required component, and an estimate only must be included as part of this "contract price" if the work is priced according to a certain formula. See id. at § 1487(4) (defining the "total contract price" as "including all costs to be incurred in the proper performance of the work, *or*, if the work is priced according to a 'cost-plus' formula, the agreed-upon price and an estimate of the cost of labor and materials") (emphasis supplied). In short, the Court finds no explicit or implicit requirement for a stand-alone written estimate in the HCCA.

The Poulins similarly assert that Hills likewise violated the HCCA by failing to provide a written contract. (See Compl. ¶31(2); S. Poulin Counterclaim at 6 ¶3(2).) In moving for summary judgment on this portion of the Complaint/Counterclaim, Hills argues more generally that the HCCA simply does not apply to the dispute between the parties. In so arguing, Hills defines the dispute between the parties as the fight over whether the Poulins agreed to pay him $500.00 for the work he did investigating possible fixes for their leaking windows. The Poulins counter that the HCCA does apply because they define the dispute as broadly encompassing all

of work to the windows on their home, which ultimately cost well over $3000 in materials and labor to repair.

Hills has the better of the argument. Whether the larger project is one encompassed by the HCCA has no bearing on the current dispute. The Poulins made it perfectly clear that they were not going to hire Hills to fix their windows. The Poulins submit that they were troubled by Hills lack of timeliness and questioned whether he had the knowledge or skills necessary to do the work. They eventually hired a different contractor to complete the work. This new contractor provided the Poulins with a written estimate and proposal for the work to be completed. (See F. & S. Poulin Affs., Ex. A.) In short, there is no dispute that the parties never entered into a written contract for Hills to repair the Poulins' windows.

It was only after the Poulins informed Hills that they were not going to hire him for the larger project that he sent them a statement for $500.00. And, of course, the parties *do* dispute whether there was any meeting of the minds that might have constituted a verbal contract requiring the Poulins to pay this money to Hills. This factual dispute, however, is not material here. For, regardless of whether this money must legally be paid, it is undisputed that the $500.00 "bill" was intended only to cover the time Hills spent attempting to diagnose the Poulins' window problem. This statement was for less than $3,000.00 and was separate from any possible agreement for materials and labor for window replacements (which ultimately was never reached with Hills). As such, the HCCA does not apply. See generally Advanced Constr. Corp. v. Pilecki, 901 A.2d 189, 200 (Me. 2006) ("All of these claims arose out of the common facts surrounding the representations made by Spence when he agreed to construct the house and his actions during and after his work on the house.")

Thus, to the extent Count III and the Counterclaim assert Hills acted in violation of the HCCA, Hills is entitled to summary judgment.

## B. Maine's Unfair Trade Practices Act, 5 M.R.S.A. 205-A et seq.

While it is true that a violation of the HCCA is viewed as *prima facie* evidence of a violation of the UTPA, Runnells v. Quinn, 890 A.2d 713, 718 (Me. 2006), by its own terms the UTPA undeniably is broader than home construction disputes. Under Maine's UTPA any "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" are unlawful. The Court must consider whether Hills is entitled to summary judgment on the more general UTPA claim.

The Poulins argue that Hills acted in violation of the UTPA, 5 M.R.S.A. § 207, by retaining a collection agency and seeking to collect payment from the Poulins when Hills had not entered into a contract with them. (See Compl. ¶31(3); S. Poulin Counterclaim at 6 ¶3(3); Poulins' Resp. to Mot. for Summ. J. ("Poulins' Resp.") (Docket # 29) at 6.) The Poulins allege that such an act amounts to an "unfair methods of competition and an unfair or deceptive acts or practices in the conduct of commerce" under Section 207. (See id.) For this alleged violation of the UTPA, the Poulins claim the following monetary losses: the expense of having to retain a lawyer and filing and service costs in bringing this lawsuit; a possible higher loan financing fee as a result of the negative credit report notations; and—due to the several month delay in the project coupled with the need to finish the project before winter—a possible increase to the total amount they ultimately paid to fix their leaking windows. The Poulins claim they have suffered a personal property loss in the form of a positive credit score. The Poulins also claim that they have suffered emotional distress as a result of Mr. Hills' actions. (See Poulins' Resp. at 6-7; Opp'n Facts at 4 ¶21, 8 ¶16.)

The Court need not reach the question of whether sending this dispute debt to a collection agency somehow constitutes an unfair competitive advantage. For, the UTPA "allows only those private litigants who have lost 'money or property' to sue for actual damages, restitution, and

9

equitable relief." In re Hannaford Bros. Co. Customer Data Sec. Breach Litig., 660 F. Supp. 2d 94, 102 (D. Me. 2009) (citation omitted); see also 5 M.R.S.A. § 213(1) (limiting relief to plaintiffs who have suffered a "loss of money or property, real or personal"). On the available record, the Court finds that the Poulins have not suffered such a loss.

Money spent "retaining a lawyer, both to prevent collection efforts by Mr. Hills and to defend against his third party claims" and for "filing the lawsuit and in service" (Poulins' Resp. at 6) are expenses that may be recoverable as attorneys fees—not actual damages. See Bartner v. Carter, 405 A.2d 194, 201 (Me. 1979) ("To avoid discouragement of such consumers by the expense of litigation, they were given the right, under the conditions specified in section 213 [of the UTPA], to the award of costs and reasonable attorneys' fees."); 5 M.R.S.A. § 213(2).

The Poulins have not identified any actual harm suffered by the alleged fifty point decrease in Dr. Poulin's credit score. While it indeed may be true that "[i]n the current economy, a fifty point credit score difference can have a dramatic effect on eligibility for loans, on employment opportunities, and social positions" (Poulins' Resp. at 7-8), the Poulins have pointed to no evidence that any of this actually occurred. Dr. Poulin's deposition testimony on "the *possible* increased finance charge on a student loan" is pure speculation. (See id. (emphasis supplied); see also Opp'n Facts at 5 ¶21 ("Dr. Poulin *may* have incurred a higher loan financing fee… .") (emphasis supplied)). The Law Court, however, has made clear that "merely speculative harms" are not "substantial enough to merit a violation of the UTPA." Tungate v. MacLean-Stevens Studios, Inc., 714 A.2d 792, 797 (Me. 1998) (citation omitted); see also In re Hannaford Bros. Co., 660 F. Supp. 2d at 100 ("Under Maine law, damages that are speculative … may not be recovered.") (citation omitted).

Total window replacement project costs that "*might* have been partially avoided" are similarly speculative. (Opp'n Facts at 5 ¶21). See In re Hannaford Bros. Co., 660 F. Supp. 2d at

10

101 ("A jury could only guess at a possible monetary value for such losses, and damages may not be based on conjecture or surmise.").

Finally, the Law Court has also held that "'without the benefit of a strained interpretation,' the plain language of Section 213 of the UTPA rules out recovery of 'damages for … mental distress.'" In re Hannaford Bros. Co., 660 F. Supp. 2d at 102 (quoting Bartner, 405 A.2d at 202-03). Bartner is a clear statement of Maine law that the Poulins cannot recover for the "emotional and mental harm suffered as a result of having a credit score compromised by an inaccurate notation." (See Poulins' Resp. at 8.)

Because the Poulins have not lost "money or property, real or personal," the Court concludes that Hills is entitled to judgment as a matter of law on any UTPA claim asserted by the Poulins.

## V. CONCLUSION

For the reasons explained herein, the Court GRANTS Defendant Hills' Motion for Summary Judgment (Docket # 26) and orders that judgment enter in favor of Defendant Hills on Count III of the Complaint (Docket # 1) and on the Counterclaim by Mrs. Poulin (Docket # 19).

SO ORDERED.

      /s/ George Z. Singal
      United States District Judge

Dated this 21st day of October, 2010.