# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| FREDERICK K. POULIN, JR.           ) <br>         Plaintiff,         ) <br>                 ) <br> v.                  ) <br>                 ) <br> THE THOMAS AGENCY,      ) <br>         Defendant.      ) | Docket No. 09-cv-575-GZS |

FREDERICK K. POULIN, JR.       )
        Plaintiff,         )
              )
v.                )
            )   Docket No. 09-cv-575-GZS
THE THOMAS AGENCY,    )
        Defendant.    )
_____)
JOHN HILLS, d/b/a GLENWOOD  )
BUILDING & REMODELING,    )
     Third Party Plaintiff,   )
            )
v.             )
            )
SUSAN POULIN,        )
    Third Party Defendant.  )
_____)
JOHN HILLS, d/b/a GLENWOOD  )
BUILDING & REMODELING,    )
       Counterclaimant,   )
            )
v.             )
            )
FREDERICK K. POULIN, JR.,   )
       Counterdefendant.   )
_____)

## ORDER ON MOTION FOR SUMMARY JUDGMENT

Before the Court is the Motion for Summary Judgment (Docket # 36) filed by Defendant The Thomas Agency. As explained herein, the Court GRANTS Defendant's Motion.

## I.  LEGAL STANDARD

Generally, a party is entitled to summary judgment if, on the record before the Court, it appears "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for

summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. A "material fact" is one that has "the potential to affect the outcome of the suit under the applicable law." Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 703 (1st Cir. 1993) (citing Anderson, 477 U.S. at 248) (additional citation omitted).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the Court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. Santoni v. Potter, 369 F.3d 594, 598 (1st Cir. 2004).

Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." Triangle Trading Co. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); Fed. R. Civ. P. 56(e). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." In re Spigel, 260 F.3d 27, 31 (1st Cir. 2001) (quoting In re Ralar Distribs., Inc., 4 F.3d 62, 67 (1st Cir. 1993)).

## II.    FACTUAL BACKGROUND

The parties have agreed to a joint statement of undisputed material facts.[1] Construing these facts in accordance with the above standards and Local Rule 56 reveals the following:

---

[1] More specifically, the parties reached an agreement whereby Plaintiff, in opposing Defendant's Motion for Summary Judgment, would neither oppose the Uncontested Statement of Material Facts ("USMF") filed by

The Thomas Agency ("Defendant" or "TA") is a debt collector licensed by the State of Maine. On or about September 29, 2008, John Hills, who does business as Glenwood Building and Remodeling ("Hills"), contacted TA to collect upon a debt of $500.00 allegedly owed to him by Frederick and Susan Poulin (hereinafter "Plaintif" or "Dr. Poulin;" "Mrs. Poulin;" collectively the "Poulins"). The origin of this debt occurred several months earlier in the Spring of 2008 when Mrs. Poulin invited Hills to provide an estimate for replacing roof windows at the Poulin home on Two Lights Road in Cape Elizabeth, Maine. Hills accepted the invitation, making a number of visits to the Poulin home and conducting outside research as well. Ultimately, the Poulins were dissatisfied with Hills' efforts and informed him that they would not be hiring him to do the work; they did, however, offer to pay Hills something for his time and asked him to send a statement. Accordingly, Hills sent a non-itemized bill to Dr. Poulin for $500.00. After receiving this bill, Dr. Poulin was outraged, refused to pay the amount requested and threw the bill away. Sometime shortly thereafter, Mrs. Poulin called Hills and left the following message on his answering machine:

> Hi John, it's Susan Poulin. Just calling because I know Fred has spoke[n] to you about sending us a bill for your time involved up to date, but I got to say I have a problem with this bill, this price and nothing here on this statement is itemized, it's a, as far as I know what you have done but I have no idea how many hours involved or anything like that so you can assume for as of right now we won't pay this, I mean, maybe half of this cost, but not 500. I am … to say.

---

Defendant (Docket # 37) nor submit a Statement of Additional Facts. (See Joint Notice (Docket # 43).). Thus, as Plaintiff has elected not to controvert the USMF submitted by Defendant, the Court deems as admitted the facts contained in the USMF, as supported by the referenced affidavits and exhibits. (Docket #s 37 & Attachs. 1-13, Docket # 39.) See D. Me. Loc. R. 56(f) ("Facts contained in a supporting … statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted. … The court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts."); see also, e.g., Dupere v. Liberty Mut. Fire Ins. Co., 377 F. Supp. 2d 272, 273 n.2 (D. Me. 2005) ("Defendant submitted a supporting Statement of Material Facts with its Motion for Summary Judgment. Plaintiff did not file an Opposing Statement of Material Facts as required by D. Me. Loc. R. 56(c). Accordingly, all facts contained in Defendant's Statement of Material Facts are deemed admitted.") (internal citations omitted).

(S. Poulin Dep. Tr. (Docket # 37-13) at 14, Ex. 2.). Soon after Hills received this phone message from Mrs. Poulin, he sent another bill to Dr. Poulin—which the Poulins also did not pay.

TA agreed to take Hills on as a client and sent a form letter to Dr. Poulin demanding payment of the alleged debt on October 5, 2008. Dr. Poulin called TA three days later and spoke with its employee Judy Picard, Collector 189. In the course of this conversation, Dr. Poulin informed Picard that he was calling to dispute the debt. In response, Picard advised him to put the fact of his dispute in writing. Dr. Poulin wrote this letter as instructed. Upon receipt of this letter on October 10, 2008, TA employee Courtney Wescott, Collector 146, reviewed the relevant records at TA. During this review, Wescott learned that Hills had made a tape of Mrs. Poulin's voicemail—transcribed verbatim above—in which she explicitly acknowledged receipt of the $500.00 bill sent to them by Hills. Approximately three days later, TA sent to Dr. Poulin, from its own records, a copy of the $500.00 statement for the work Hills did for the Poulins.

On October 20, 2008, TA employee Eve Johnson, Collector 66, called Hills. During the course of this conversation, Hills informed Johnson that he would send TA a package of documents showing all the work he had done for the Poulins.

The next day, TA employee Hanna Onjea, Collector 172, called the Poulin home and spoke with Mrs. Poulin. In that phone call, Mrs. Poulin described their dispute with Hills as follows: she and her husband had asked Hills for an estimate for a window replacement job, but they had then decided to hire someone else; her husband had informed Hills that he would be happy to pay for his time, but they did not like the bill Hills ultimately sent to them. As a result, Mrs. Poulin informed Onjea, they were disputing the bill and would be securing legal counsel if the matter needed to be taken to the next step. Onjea responded that she would notify her

manager and that TA would get back to them.  Following this conversation with Mrs. Poulin, Onjea alerted Wescott that the Poulins were threatening to retain a lawyer.

On or about November 18, 2008, Johnson had another telephone conversation with Hills. During the course of this phone call, Hills indicated that he did not want any further phone or letter collection efforts directed to the Poulins.  Additionally, it was agreed that TA would report the alleged debt to the consumer reporting agencies in the hope that this action would spur a payment from Dr. Poulin.  Accordingly, on or about January 15, 2009, as part of a regular monthly process, TA "credit report[ed]" the debt allegedly owed to Hills by the Poulins.  (USMF at ¶¶14-15.)  In this report to the consumer reporting agencies, TA included specific coded notations to signal that this debt had been disputed by the alleged debtor.  (See Ault Aff. (Docket # 37-1) ¶10; id. ¶18.)

TA had no contact with the Poulins between the October 21, 2008 phone call with Mrs. Poulin and mid-August 2009.  On or about August 17, 2009, Dr. Poulin and his daughter, MP, applied via computer for loans from the Maine Educational Loan Authority ("MELA") to cover the expenses of MP's next year of college.[2]  At the time Dr. Poulin and MP applied for this loan, the Poulins had a net worth of $1,904,100.00 and Dr. Poulin had generated wages and salary of approximately $350,000.00 per year during each of the three prior years.[3]  When Dr. Poulin and MP pressed the submit button, computers processed the data, including Dr. Poulin's credit report, and sent the results to MELA.

Within seconds of the submission—at 11:04 am on August 17, 2009—Dr. Poulin and MP received denials of their loan applications.  In each instance, the loan rejection letter stated that

---

[2] Dr. Poulin and MP's loan applications, addressed to MELA, were processed by its servicing entity, Maine Educational Services Foundation ("MES").  MES maintains a computer-generated services history for accounts.

[3] Dr. Poulin, a cardiologist, has been employed by Maine Cardiology Associates since 1981.

the request was denied due to "charge off or collections accounts" found on Dr. Poulin's credit report.  (See Erickson Dep. Tr. (Docket # 37-10) at 8-9 (Ex. 2A at Bates MES0009-MES0010).)  MELA's loan criteria requires denial of a loan application if there was an account in collection of $250.00 or greater.  The alleged debt to Hills and the fact that it was disputed was reflected on the credit report submitted to MELA with Dr. Poulin and MP's loan applications.  (See id. at 7 (Ex. 2A at Bates MES0004) (Trans Union Credit Report listing, under "Collections," a balance of $500.00 to Creditor "Glennwood Builders (sic)" with the notation "account information dispute").)  The credit report also indicated a "serious delinquency."  (See id.)  As of the date of the loan denials and continuing until August 18, 2009, Dr. Poulin's credit score was 673.

The rejection letters also indicated that if there were "extenuating circumstances" the applicant could contact MES to discuss the denial.  (See id.)  Immediately after finding out that the loan applications he had filed had been rejected, Dr. Poulin contacted MES to discuss the denial.  Shortly after calling MES, at 12:29 pm on August 17, 2009, Dr. Poulin—who was now "angry"—called TA and spoke first with Amberlee Edgerton-Moriarity, Collector 147, and then with Wescott.  (See USMF ¶35A.)  In both of these conversations, Dr. Poulin indicated that he had just learned that the alleged debt to Hills had been credit reported and that he was retaining counsel.

The next day—on or about August 18, 2009—TA employee Johnson spoke with Hills and advised him of the conversations that had transpired with Dr. Poulin.  After hearing this information, Hills indicated that he wanted to close the account and abandon efforts to collect through TA.  That same day, TA closed the Poulin account and returned the file to Hills.  TA also contacted the consumer reporting agencies by email to delete the entry reflecting the alleged debt owed by the Poulins to Hills which Dr. Poulin had disputed.  That same day, Edgerton-

Moriarity telephoned Dr. Poulin to advise him the account had been closed and a deletion request had been sent to the consumer reporting agencies.

That deletion on Dr. Poulin's credit report occurred in due course, thereby allowing MP and Dr. Poulin to obtain a loan without going through the formal appeal process at MELA. Rather, on the following day—August 19, 2009—Dr. Poulin was able to call MES to inform them that an error on his credit report had been corrected. The loan was approved on August 20, 2009 after Dr. Poulin renewed the applications. At the time the loan applications were approved, Dr. Poulin's credit score was 733; his credit report, though still showing "serious delinquencies," no longer showed the Hills collection item. (See Erickson Dep. Tr. at 10 (Ex. 2A at Bates MES0013).) Dr. Poulin paid the same interest rate and guarantee fee for the approved loan as he would have paid had the initial applications on August 17, 2009 been approved rather than denied.

To date, TA collects debts for Maine Cardiology Associates, Dr. Poulin's employer. In doing so, TA follows the same procedures as it followed in attempting to collect upon the Hills account from the Poulins. TA credit reports consumers who owe Maine Cardiology Associates money even when they have disputed the debt. The policy of TA is to credit report accurately, to report disputes and to delete promptly when a file has been closed.

## III.   PROCEDURAL HISTORY

Based on these facts, Plaintiff Dr. Poulin filed this lawsuit on November 16, 2009, bringing a single claim against Hills for violating the Maine Unfair Trade Practices Act (Count III) as well as five claims against TA under the federal Fair Debt Collection Practices Act (Count I), the Maine Fair Debt Collection Practices Act (Count II), the Maine Fair Credit Reporting Act (Count IV), and state law tort claims of interference with a prospective economic advantage and

invasion of privacy (Counts V-VI).  (See Compl. (Docket # 1).)  On April 27, 2010, the Court

granted TA's motion to dismiss the state law claims contained in Counts IV through VI for

failure to state a claim.  (See Order on Mots. to Dismiss (Docket # 12).)[4]  The Court granted

summary judgment for Hills on Count III of the Complaint on October 21, 2010.  (See Order on

Mot. for Summ. J. (Docket # 35).)[5]

TA now moves for summary judgment on the two remaining counts of Plaintiff's original

Complaint, the claims brought under the federal Fair Debt Collection Practices Act ("FDCPA" or

"Act"), 15 U.S.C. § 1692 et. seq., and its state law counterpart, the Maine Fair Debt Collection

Practices Act ("MFDCPA"), 32 M.R.S.A. § 11013 et seq.  (Counts I & II).[6]

## IV.    DISCUSSION[7]

In Counts I and II of his Complaint, Plaintiff alleges that Defendant violated federal and

state law when it reported the $500.00 Hills debt to various consumer reporting agencies despite

the fact that Plaintiff informed Defendant that the debt had no legal basis.  (See Compl. at 4-5.)

Plaintiff asks this Court to declare that his rights were violated and award actual damages plus

---

[4]  In this same Order, the Court denied Hills' motion to dismiss Count III.  (See id. at 6-7.)
    Plaintiff's wife, Susan Poulin, was then brought into this lawsuit by Hills vis-à-vis his May 13, 2010
Answer to Count III, in which he also asserted—as a Third Party Complaint against Mrs. Poulin and as
Counterclaims against Dr. Poulin—state law claims for breach of contract (Count I), unjust enrichment (Count II),
quantum meruit (Count III) and violations of the Maine Construction Contracts Act ("CCA"), 10 M.R.S.A. § 1111
et seq. (Count IV).  (Def. Hills' Answer, Counterclaim & Third Party Claim ("Hills' Answer") (Docket # 13) at 8-9
¶¶10-23.).  On June 3, 2010, Mrs. Poulin filed her Answer to Hills' Third Party Complaint, and asserted a
Counterclaim against Mr. Hills for violations of the Maine Unfair Trade Practices Act—the same allegations made
in Count III of the original Complaint.  (See S. Poulin Answer & Counterclaim (Docket #19) at 6 ¶¶1-5.)

[5]  In granting Hills' motion for summary judgment in its entirety, the Court ordered that judgment enter in favor of
Hills' on both Count III of the Complaint (Docket # 1) and on the Counterclaim by Mrs. Poulin (Docket # 19).  (See
id. at 11.)

[6]Hills' Third Party Complaint against Mrs. Poulin and Counterclaims against Dr. Poulin also remain and will be
addressed below.

[7]  In opposing Defendant's Motion for Summary Judgment, Plaintiff filed both a Response on November 24, 2010
and a Supplemental Response on December 8, 2010.  (See Docket #s 46 & 48).  As Plaintiff did not seek leave to
file a sur-reply, the Court did not consider the Supplemental Response (Docket # 48) in its analysis.  Having
reviewed the filing, however, the Court notes that its consideration would not have changed the outcome.

such additional damages as the Court may allow, not exceeding $1,000 per violation, pursuant to 15 U.S.C. § 1692(k) and 32 M.R.S.A. § 11054. (Id.) In response, Defendant contends that Plaintiff's suit is time-barred, and that in any event, all of its actions were in complete compliance with the FDCPA or are protected by the "bona fide error" defense set forth in 15 U.S.C. 1692(k).[8]

All of the facts before the Court have been established by stipulation. As such, the Court readily finds that there are no genuine issues of material fact to prevent judgment from entering for one of the parties on the basis of the pending motion. See, e.g., Young v. Wall, C.A. No. 07-034, 2010 WL 2541053, at *3 (D. R.I. Jan. 28, 2010) ("Here, the parties have submitted … a joint statement of material facts. As there are no genuine issues of material fact, this matter is ripe for decision on summary judgment.") Plaintiff has not filed a cross motion for summary judgment.

The Court addresses each of Defendant's arguments, in turn, below.

A. *Statute of Limitations*

The FDCPA has a one year statute of limitations. See 15 U.S.C. § 1692k(d). Defendant asserts that Plaintiff's cause of action accrued when he first informed Defendant that the debt was disputed—that is, in early October 2008. As Plaintiff did not file this cause of action until November 16, 2009, Defendant insists that the statute of limitations period had already lapsed for all of Plaintiff's claims. Alternatively, Defendant argues that the Court should limit its

---

[8] Given the nearly-identical statutory structure of the FDCPA and the MFDCPA, to the extent Plaintiff brings identical claims under the state law counterpart in Count II, the same analysis applies. See Sweetland v. Stevens & James, Inc., 563 F. Supp. 2d 300, 303 (D. Me. 2008) ("[Plaintiff] claims damages under the FDCPA and the MFDCPA; the statutory remedies for both claims, however, are identical. The Court will proceed under the FDCPA.") (internal citation omitted). In any event, "the parties did not brief the MFDCPA claim at all… . Having failed to do so, Plaintiff has waived any argument that Defendant['s] liability under the MFDCPA differs from his liability under the federal statute, and Defendant … is entitled to summary judgment on this claim[.]" Shapiro v. Haenn, 222 F. Supp. 2d 29, 44 (D. Me. 2002).

examination only to events occurring after November 16, 2008.  Plaintiff counters that he only became aware of Defendant's allegedly illegal actions on or about August 17, 2009, when the loan applications were first denied, and that accordingly, all of his claims were filed well within the statutorily-allowed time period.

Plaintiff has the better of the argument.  Once a debt has been disputed by a consumer, the FDCPA prohibits any debt collection activity until verification occurs.  See 15 U.S.C. § 1692g(b) "Thus, a cause of action under the FDCPA does not arise until the illegal debt collection activity occurs and the statute of limitations does not begin to run until that time." Bond v. U.S. Bank Nat'l Ass'n, No. 09-14541, 2010 WL 1265852, at *3 (E.D. Mich. March 29, 2010); see also, e.g., McGee v. Moon, 685 F. Supp. 2d 737, 745 (N.D. Ohio 2010) (plaintiff's cause of action under the FDCPA accrued, and statute of limitations began to run, on the date defendants engaged in the allegedly illegal debt collection practices).

All of Plaintiff's FDCPA claims are premised on the notion that Defendant had some sort of obligation to verify the legal status of the alleged debt prior to taking any sort of affirmative collection action.  The record establishes that Defendant sent a collection letter to Plaintiff in early October, 2008, and shortly thereafter, Plaintiff contacted Defendant to dispute that debt. After learning that Plaintiff disputed the debt, the first discernable collection action taken by Defendant was its decision to report the Hills' debt to the consumer reporting agencies.  It is undisputed that Defendant did not first "credit report" Plaintiff's alleged debt to Hills until January 15, 2009.  (See USMF ¶15.) As such, even though the bulk of direct interactions between TA and Plaintiff occurred in October and early November of 2008, the Court finds that the statute of limitations period did not begin to run any earlier than January 15, 2009.  See, e.g.,

Purnell v. Arrow Fin. Servs., LLC, 303 F. App'x 297, 304 (6th Cir. 2008); Kaplan v. Assetcare, Inc., 88 F. Supp. 2d 1355, 1360 (S.D. Fla. 2000).

Indeed, the Court finds no reason to doubt that Plaintiff only first became aware that this debt appeared on his credit report in August of 2009—just a few short months before this suit was filed. See e.g., Akalwadi v. Risk Mgmt. Alts., Inc., 336 F. Supp. 2d 492, 501 (D. Md. 2004) (FDCPA's one-year statute of limitations for debt collector's inaccurate credit reporting began to run only when the consumer obtained credit report evidencing possible FDCPA violations, not when debt collector first reported the debt to credit reporting agency unbeknownst to consumer); Flores v. Millennium Interests, Ltd., 273 F. Supp. 2d 899, 901 (S.D. Tex. 2003) (debtor's claim against the collection agency under FDCPA arising from its provision of allegedly erroneous negative creditor report accrued at the time the bank denied debtors' application to refinance loan).

In short, the Court concludes that Plaintiff's suit is not time-barred. The Court, therefore, now turns to the substantive FDCPA arguments.

### B. FDCPA Allegations

Plaintiff claims Defendant violated the FDCPA when it credit reported the alleged $500.00 debt to Hills despite the fact that Plaintiff challenged the validity of that debt. The FDCPA "imposes civil liability on 'debt collector[s]' for certain prohibited debt collection practices." Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA, -- U.S. --, --, 130 S. Ct. 1605, 1608 (2010). "The FDCPA is not intended to stifle all debt collection practices." Russell v. Absolute Collection Serv., Inc., No. 1:09CV515, 2010 WL 4363393, at *3 (M.D.N.C. Oct. 27, 2010). Rather, "[t]he FDCPA was enacted to protect debtors from *abusive* debt collection practices." Chiang v. Verizon New Eng. Inc., 595 F.3d 26, 41 (1st Cir. 2010) (emphasis

supplied) (citing 15 U.S.C. § 1692(e)) (additional citations omitted). "To that end, it regulates

debt collectors' tactics and, inter alia, creates a private cause of action for victims of 'oppressive

or offensive collection agency behavior.'" Id. (citation omitted); see also Jerman, 130 S. Ct. at

1608.

"In order to prevail on a[] FDCPA claim, a plaintiff must prove that (1) he was the object

of collection activity arising from consumer debt, (2) the defendant is a debt collector within the

meaning of the statute, and (3) the defendant engaged in a prohibited act or omission under the

FDCPA." Krasnor v. Spaulding Law Office, 675 F. Supp. 2d 208, 211 (D. Mass. 2009) (citation

omitted). The parties do not dispute that Plaintiff is a consumer and that TA is a "debt collector"

as defined by the FDCPA. See 15 U.S.C. § 1692a(6). With regard to the critical third-prong—

whether Defendant engaged in a prohibited act or omission—Plaintiff contends that Defendant

violated the FDCPA in two ways:  by "reporting an account as in collection when no such

account was legally owed" and "failing to investigate the legality of the account." (Compl. ¶¶22,

26.)[9]  In particular, Plaintiff argues that these acts and alleged omissions by Defendant all

violated the following provisions of the FDCPA:  engaging in harassing, oppressive, or abusive

debt collection, in violation of 15 U.S.C. § 1692d; falsely representing the character, amount or

legal status of a debt, in violation of id. § 1692e(2)(a); communicating or threatening to

communicate credit information known to be false, in violation of id. § 1692e(8); and using false

representation or deceptive means to collect or attempt to collect a debt, in violation of id. §

---

[9] In his Complaint Plaintiff also alleged that Defendant violated the FDCPA by "failing to note" the debt's disputed status when reporting that account as in collection. (See id.).  Plaintiff has since acknowledged both that Defendant did in fact report the account as disputed and that the fact of dispute was reflected in his credit report.  (See USMF ¶¶15-16; Pl.'s Resp. to Mot. for Summ. J. at 10.)  As will be discussed in more detail below, see *infra* at 16-17, had Defendant failed to communicate to the consumer reporting agencies that the debt was disputed, this omission could have formed the basis for liability under the FDCPA.  See 15 U.S.C. § 1692e(8) (stating that "the failure to communicate that a disputed debt is disputed" constitutes a "false, deceptive or misleading representation" under the Act);  see also Brady v. Credit Recovery Co., Inc., 160 F.3d 64, 66-67 (1st Cir. 1998); Quale v. Unifund CCR Partners, 682 F. Supp. 2d 1274, 1280 (S.D. Ala. 2010).

1692(e)(10).  In moving for summary judgment, Defendant contends that the actions it took to collect upon the debt disputed by Plaintiff were in complete compliance with its obligations under the FDCPA.

Plaintiff's primary argument is that under these provisions of the FDCPA, Defendant was obligated to investigate whether the debt was valid prior to taking any sort of affirmative collection action on behalf of its client, Hills.  When a consumer notifies a debt collector in writing of a dispute over a debt, as Plaintiff did, the FDCPA requires the debt collector to:

> cease collection of the debt, or any disputed portion thereof, until the debt collector obtains verification of the debt or a copy of a judgment, or the name and address of the original creditor, and a copy of such verification or judgment, or name and address of the original creditor, is mailed to the consumer by the debt collector.

Id. § 1692g(b).  As the Plaintiff points out, the FDCPA does not explicitly define what constitutes proper debt "verification."  Nor has the First Circuit specifically addressed what constitutes appropriate verification under the FDCPA.  Plaintiff, therefore, encourages the Court to turn to carefully selected portions of the Act's legislative history.  (See Resp. to Mot. for Summ. J. at 2, 9.)

The Court declines this invitation.  Other courts in examining the language and legislative history of the FDCPA uniformly have held that a "debt collector need not do much to verify a debt."  Forman v. Lauinger, No. 06-40-M-DWM, 2007 WL 1580082, at *6 (D. Mont. May 31, 2007).  Indeed, from this Court's research, it appears as though every court to have examined the issue has held that the verification provided here—confirmation of the amount of the debt and the identity of the creditor, which is then relayed to the debtor—is sufficient.  In the case of Clark v. Capital Credit & Collection Services, Inc., 460 F.3d 1162 (9th Cir. 2006), the Ninth Circuit articulated the baseline standard for a verification of a debt.  In that case, the Ninth

Circuit adopted the standard as articulated by the Fourth Circuit, holding that "[a]t the minimum, 'verification of a debt involves nothing more than the debt collector confirming in writing that the amount being demanded is what the creditor is claiming is owed." Id. at 1173-74 (quoting Chaudhry v. Gallerizzo, 174 F.3d 394, 406 (4th Cir. 1999)).[10]  As these Circuit Courts have explained, this provision of the FDCPA is not intended to give a debtor a detailed accounting of the debt to be collected.  Instead, "[c]onsistent with the legislative history, verification is only intended to eliminate the problem of debt collectors dunning the wrong person or attempting to collect debts which the consumer has already paid." Chaudhry, 174 F.3d at 406 (citation and internal punctuation omitted).

Here, the Court agrees with Defendant that it complied with FDCPA's verification requirement by providing Plaintiff with the identity of the original creditor, Hills, and informing Plaintiff that its client had verified the balance to be true, correct and still owing.  More specifically, upon Plaintiff's request for verification in mid-October 2008 (i.e., Plaintiff's phone call and subsequent letter to TA in which he disputed the validity of the debt), Defendant examined its own records and discovered the recording of the voicemail in which Plaintiff's wife confirmed that they had received a $500.00 bill from Hills.  Next, on October 13, 2008, Defendant provided Plaintiff with a copy of the $500.00 bill statement from Hills.  Defendant confirmed the account with its own client on October 20, 2008 and November 18, 2008.  Finally, Defendant made an additional phone call to the Poulin home, during which Mrs. Poulin—in her effort to explain the dispute between Hills and Plaintiff—again verified the existence of the $500.00 debt.  It was only after Defendant took these steps that it reported Plaintiff's

---

[10] In Clark, the debt collector obtained an itemized statement of the debtor's account from the creditor.  Clark, 460 F.3d at 1174.  In Chaudhry, the debt collector received a copy of the creditor's computerized summary of the debtor's loan transactions, including a running account of the debt amount, a description of every transaction, and the date the transactions occurred.  Chaudhry, 174 F.3d at 406.

delinquency to the various consumer reporting agencies. Applying the standard set out by Clark and Chaudhry, Defendant adequately verified the debt to Plaintiff prior to its January 2009 credit report. See, e.g., Clark, 460 F.3d at 1174 (noting that an itemized statement was sufficient to verify a past consumer debt); Chaudry, 174 F.3d at 406 ("There is no concomitant obligation to forward copies of bills or other detailed evidence of the debt.").

Despite acknowledging this overwhelming weight of authority, Plaintiff argues that simply confirming the amount due on a debt is insufficient when the consumer explicitly relays that there is no legal basis for the debt. Plaintiff insists that because Defendant was informed that the debt alleged by Hills was invalid, its decision to "credit report" this debt amounted to a violation of various provisions of Section 1692e, which prohibits the false representation of the legal status of the debt and communicating information known to be false. While Plaintiff may wish this to be a true statement of the law, he unfortunately can cite to no legal authority to support his argument.

In fact, numerous courts have held to the contrary that the FDCPA does not require a debt collector to independently investigate the merit of the debt and that a debt collector can rely on its clients' representations regarding the validity of the debt. See e.g., Clark, 460 F.3d at 1174 ("Within reasonable limits, [Defendants] were entitled to rely on their client's statements to verify the debt. Moreover, the FDCPA did not impose upon them any duty to investigate independently the claims presented[.]") (internal citations omitted); Rudek v. Frederick J. Hanna & Assoc., P.C., No. 1:08-cv-288, 2009 WL 385804, at *2 (E.D. Tenn. Feb. 17, 2009) (collecting cases); Shapiro v. Haenn, 222 F. Supp. 2d 29, 44 (D. Me. 2002) ("[D]ebt collectors may rely on the information their clients provide, and the FDCPA does not require them to conduct their own investigation into the amount or validity of the underlying loan.") (citations omitted). This

remains true even when the consumer has specifically challenged whether the amount alleged is due at all. See, e.g., Becker v. Genesis Fin. Servs., No. CV-06-5037, 2007 WL 4190473, at *7 (E.D. Wash. Nov. 21, 2007); Bleich v. Revenue Maximization Grp., Inc., 233 F. Supp. 2d 496, 500 (E.D.N.Y. 2002); Ducrest v. Alco Collections, Inc., 931 F. Supp. 459, 462 (M.D. La. 1996). Given that Plaintiff's wife twice confirmed—in a voicemail to Hills, and in a phone conversation with Defendant—that they had received a $500.00 bill from Hills and had chosen not to pay that bill, it hardly seems unreasonable for Defendant to have relied on Hills' representation that Plaintiff owed him that sum of money.[11]

In any event, the final, fatal blow to all of Plaintiff's arguments is the fact that Defendant in no way falsely represented the legal status of the debt. The FDCPA prohibits the use of any false, deceptive or misleading means to collect a debt, see 15 U.S.C. § 1692e, including "[c]ommunicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed." 15 U.S.C. § 1692e(8). Thus, the FDCPA specifically contemplates the circumstances presented here, and obligates only that a debt collector must "communicate" the disputed nature of the debt. See, e.g., Brady, 160 F.3d at 67 (Section "1692e(8) merely requires a debt collector who knows or should know that a given debt is disputed to disclose its disputed status to persons inquiring about a consumer's credit history."); Wilhelm v. Credico, Inc., 519 F.3d 416, 418 (8th Cir. 2008) ("[I]f a debt collector elects to communicate 'credit information' about a consumer, it must not omit a piece of information that is always material,

---

[11] Plaintiff also seems to suggest that Defendant "used false representation or deceptive means to attempt to collect from" Plaintiff in violation of the FDCPA when its employee "agreed to investigate [the dispute] further and follow up with Dr. Poulin before it reported the account." (Pl.'s Resp. at 11 (citing SUMF ¶ 13).) The record establishes that TA Employee Onjea informed Mrs. Poulin that she would notify her manager that the Poulins were disputing the bill and would get back to her. It is also true that the record establishes that Defendant had no further contact with Plaintiff after this phone conversation. While Defendant's failure to follow through with this promise may be poor customer service, Plaintiff cannot establish a violation of the FDCPA based on this failure. And, any potential breach of a contract claim was not plead in the original Complaint.

namely, that the consumer has disputed a particular debt."). The Act in no way gives consumers some sort of veto power over collection agencies. The evidence before the Court firmly establishes that, in reporting the debt to the credit reporting agencies, Defendant specifically flagged the debt as disputed. (See USMF ¶¶15-16.)

In sum, the Court concludes that Defendant satisfied all of its legal obligations under the FDCPA. Upon receiving notification from Plaintiff that the debt was disputed, Defendant obtained verification of the debt and mailed such verification—a copy of the $500.00 statement from Hills—to Plaintiff. In obtaining verification of the debt, Defendant appropriately relied upon its client's representation that the debt was valid. It was only after mailing verification of the debt to Plaintiff that Defendant took any sort of affirmative collection action against Plaintiff by credit reporting the debt. And, in taking this collection action, Defendant appropriately marked the debt as disputed. Defendant's truthful credit reporting in no way violated Sections 1692d, 1692e(2)(a), 1692e(8) or 1692(e)(10) of the FDCPA.[12]

Thus, while the Court "can understand, and indeed, sympathize with the frustration experienced by" Plaintiff, Bleich, 233 F. Supp. 2d at 500, the facts simply do not establish that Defendant violated either the FDCPA or the MFDCPA. Therefore, his remedy is with the legislature—not with this Court. Defendant the Thomas Agency is entitled to summary judgment on both Counts I and II.

---

[12] Having found that Defendant did not act in violation of the FDCPA, the Court need not reach the bona fide error affirmative defense asserted by Defendant. Under the bona fide error defense, a debt collector will not be liable if the debt collector "shows by a preponderance of the evidence that: (1) the violation was not intentional and; (2) resulted from a bona fide error; (3) notwithstanding the maintenance of procedures reasonably adopted to avoid any such error." 15 U.S.C. 1692k. See also Jerman, 130 S. Ct. at 1608. For the sake of completeness of the record, however, the Court notes that the affidavits of Defendant employees George Ault, Vaughn Clark, Amberlee K. Edgerton Moriarity, Eve Johnson, Hannah Onjea and Courtney Wescott all aver that Defendant has established procedures that are reasonably adapted to avoid any type of bona fide error. (See Docket #s 37-1, 37-2, 37-3, 37-5, 37-6, & 37-7.) After Plaintiff disputed the bill in early October, 2008, Defendant followed its procedures for verifying the account. Plaintiff's wife twice confirmed—in a voicemail to Hills, and in a phone conversation with Defendant—that they had received a $500.00 bill from Hills and had chosen not to pay that bill. Defendant has established sufficient evidence that any violation was not intentional as its reliance on Hills' representations regarding the status of the debt was reasonable. See Clark, 460 F.3d at 1176.

**V.     CONCLUSION**

For the reasons explained herein, the Court GRANTS Defendant the Thomas Agency's Motion for Summary Judgment (Docket # 36) and orders that judgment enter in favor of Defendant The Thomas Agency on Counts I and II of the Complaint (Docket # 1).

What remains in this case are the four state contract law claims—for breach of contract, unjust enrichment, quantum meruit and violations of the Maine Construction Contracts Act, 10 M.R.S.A. § 1111 et seq.—asserted in Defendant Hills' Third Party Complaint and Counterclaim. The Court declines to exercise its discretion to invoke supplemental jurisdiction over these counts pursuant to 28 U.S.C. § 1367.  Counts I-IV of the Counterclaim and Third Party Claim filed by John Hills d/b/a Glenwood Building & Remodeling (Docket # 13) are hereby DISMISSED WITHOUT PREJUDICE to Defendant Hills filing these same claims in state court.

SO ORDERED.


/s/ George Z. Singal
United States District Judge

Dated this 13th day of January, 2011.